# UNITED STATES DISTRICT COURT
for the
Middle District of Tennessee

In the Matter of the Search of  )
*(Briefly describe the property to be searched*  )
*or identify the person by name and address)*  )  Case No. 21-mj-2059
  )
THE RESIDENCE LOCATED AT 2711 JENKINS  )
STREET, NASHVILLE, TENNESEE  )
  )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

THE RESIDENCE LOCATED AT 2711 JENKINS STREET, NASHVILLE, TENNESEE, AS DESCRIBED IN ATTACHMENT A.

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) and 846 | Possession with Intent to Distribute Controlled Substances and Conspiracy |
| 18 U.S.C. 1956 and 1957 | Money Laundering |

The application is based on these facts:
See attached Statement in Support

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Timothy Finney
*Applicant's signature*

Timothy Finney, DEA SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone *(specify reliable electronic means)*.

Date: November 16, 2021

*Judge's signature*

City and state: Nashville, Tennessee        Hon. Jeffery S. Frensley, U.S. Magistrate Judge
*Printed name and title*

# STATEMENT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Timothy Finney, being first duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND

1.  I, Timothy Finney, am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been a certified Law Enforcement Officer in the State of Tennessee since 2016. In 2016, I began my career as a Patrol Officer for the Brentwood Police Department in Brentwood, TN. In 2021, I was hired as a Special Agent by the United States Drug Enforcement Administration. I am currently employed by the Drug Enforcement Administration (DEA) Nashville District Office, Task Force Group One, as a Special Agent (SA).

2.  During my tenure as a Patrol Officer and DEA Special Agent, I have conducted numerous narcotics related investigations involving violations of federal and state narcotics laws. Currently, I am responsible for investigating crimes that involve the unlawful possession of illicit narcotics, importation and exportation of illegal narcotics, the possession with the intent to distribute controlled substances, the distribution of controlled substances, the use of communication facilities to further these offenses, and the related crime of laundering monetary instruments, all in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 952, and Title 18, United States Code, Sections 1956, and 1957.

3.  Throughout these investigations, I have used or participated in a variety of investigative techniques and resources in several investigations; including, conducting physical

and electronic surveillance, managing the use of confidential sources ("CS") and informants, and securing other relevant information using other investigative techniques. Based on these investigations, my training and experience, and conversations with other Special Agents, as well as other law enforcement personnel (hereafter collectively referred to as "Agents"), I have become familiar with methods used by controlled substances traffickers to safeguard their controlled substances, to distribute controlled substances, and to collect and launder related controlled substances proceeds.

4. The facts in this statement come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This statement is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Since this Affidavit is being submitted for the limited purpose of securing a search warrant for the **Target Premises**, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that issuance of the requested search warrants is proper.

## THE TARGET PREMISES

6. This Affidavit and the accompanying Application seeks the issuance of a search warrant for a residence located at 2711 Jenkins St., Nashville, Tennessee (hereinafter the "**Target Premises**").

7. The **Target Premises** is located in the Middle District of Tennessee and are more fully described in Attachment A. I further request that a warrant permit a search for and seizure of the items of evidence listed in Attachment B.

**PROBABLE CAUSE**

8. During the Month of October 2021, Drug Enforcement Administration (DEA), Agents debriefed a confidential source (CS) that provided information on Terry Eugene FISHER, a dealer in the Nashville, TN area capable of supplying large quantities of methamphetamine. FISHER was utilizing telephone number 615-578-7125 to coordinate the narcotic transaction with the CS.

9. Investigative open source research revealed FISHER is the owner of a property at 4513 Old Clarksville Pike, Clarksville, TN 37043. FISHER owns the property with a Rekeesha Fisher. Tax records identify FISHER's mailing address associated with this property as 2711 Jenkins St., Nashville, TN 37208. Open source records revealed the **Target Premises** is associated with Rekeesha Ellison. Based on my training, experience, and knowledge of this investigation, I believe Rekeesha Ellison and Rekeesha Fisher to be the same person. I believe, based on knowledge, training, and experience, the **Target Premises** is kept under Ellison's name in order to conceal its connection to FISHER from law enforcement officials.

10. Open source records further identified FISHER as the owner of K & T Cleaning Service Inc. at 4235 Hillsboro Pike, Ste 300, Nashville, TN 37215. State of Tennessee Department of Labor information revealed FISHER has reported no income for the year of 2021. Federal Bureau of Investigation (FBI) Special Agent Robert Barrett interviewed an employee at the reception desk at 4235 Hillsboro Pike, Nashville, TN. The employee stated K & T Cleaning Service, Inc. is not a tenant in the building. I know, through training and experience, narcotic traffickers primarily deal in cash proceeds and will use businesses to convert the illegal proceeds into revenue with an apparent legal source.

11. In October 2021, Agents obtained a state court order to obtain the Global Positioning System (GPS) and cell site information from FISHER's cell phone 615-578-7125. This order

3

Case 3:21-mj-02059   Document 1-1   Filed 11/16/21   Page 4 of 20 PageID #: 12

provided Agents with "pings" periodically with a general location of FISHER's cell phone. The cell phone pings provided a location with an average accuracy of approximately 100 - 600 meters. The data collected from FISHER's cell phone ping placed his phone in the general area of the **Target Premises** during the overnight hours.

12. During the Month of October 2021, Agents utilized a RCSO CS to purchase approximately one pound of crystal methamphetamine from FISHER in Nashville, Tennessee. On October 15, 2021, at approximately 7:10 a.m., surveillance observed a blue Dodge Ram truck with TN dealer plate 004153D, registered to Nations Auto Sales, Inc. parked at the **Target Premises**. During this time FISHER's cell phone ping data also placed his cell phone in the area of the **Target Premises**.

13. At approximately 7:27 a.m., FISHER's cell phone ping data placed his cell phone in the area of the Hartman Park Regional Recreation Center located at 2801 Tucker Road, Nashville, TN. Based on the above, surveillance responded to the area and observed the blue Dodge Ram parked in front of the Hartman Park Regional Recreation Center gym facilities.

14. At approximately 8:06 AM, FISHER was observed leaving the gym facilities at Hartman Park. Surveillance then observed the blue Dodge Ram depart the parking lot of the recreation center and drive in the direction of the meet location.

15. At approximately 8:10 AM, surveillance observed Fisher's Vehicle arriving at the Kwik Sak located at 4160 Clarksville Pike, Nashville, TN where FISHER was observed meeting with the CS. While at the Kwik Sak, FISHER was heard by Agents via listening device conversing with the CS. During the conversation, FISHER told the CS that "IT" (crystal methamphetamine) was in the back (referencing to the back seat of the truck).

16. At approximately 8:18 AM, the CS gave FISHER the money in exchange for the crystal methamphetamine. During the debriefing with the CS, the CS stated FISHER opened the rear door of his vehicle and the CS retrieved a weighted grocery sack from the rear seat. DEA lab tested the substances and determined that it was approximately 399.09 grams of pure methamphetamine.

17. After the exchange, Agents observed FISHER leave the gas station and return to the parking lot of the Hartman Park Regional Recreation Center. Surveillance was terminated at this time.

18. During the Month of November 2021, Agents utilized a RCSO CS to purchased approximately one pound of crystal methamphetamine from FISHER in Nashville, Tennessee. On November 1, 2021, at approximately 7:10 a.m., surveillance observed the blue Dodge Ram parked on the street across from the **Target Premises**. During this time FISHER's cell phone ping data also placed his cell phone in the area of the **Target Premises**.

19. At approximately 7:17 AM, Agents observed FISHER exit the **Target Premises** and get into the driver's seat of the blue Dodge Ram. FISHER's children got into the vehicle also. Agents observed FISHER drive to a school in Clarksville, TN and drop his children off. FISHER then drove to 4513 Old Clarksville Pike, Clarksville, TN 37043. At this location, FISHER met with four unidentified males and was observed moving what appeared to be plastic tool containers from his truck to the residence. FISHER and two of the unidentified males then left the area. During a later debriefing with the CS, the CS stated FISHER described the unidentified males as his "workers."

20. At approximately 9:05 AM, Agents observed FISHER arrive to 30 Dry Creek Rd., Apt. 2505, Goodlettsville, TN 37072. FISHER parked his truck several units down from Apartment 2505. FISHER left his "workers" and walked down to Apartment 2505. FISHER entered Apartment 2505 alone for approximately 10 minutes. When FISHER exited Apartment 2505, he was recorded

on video locking the front door from the outside with a key. Fisher then returned to his vehicle and left the area.

21. At approximately 9:30 AM, FISHER arrived in the area of Hartman Park Regional Recreation Center. FISHER parked his vehicle across the street at 2750 Tucker Rd., Nashville, TN (Saint Pius X Elementary School) and walked across the street to the parking lot of the Recreational Center to meet with the CS.

22. FISHER delivered a white weighted grocery sack to the CS in exchange for money. Agents later determined the grocery sack contained approximately one pound of crystal methamphetamine. Agents field tested the substance which resulted in a presumptive positive result for methamphetamine. During a debriefing with the CS, the CS stated FISHER placed the weighted sack in the trunk of the CS's vehicle. The CS also stated FISHER told him he had "plenty" of methamphetamine and wants to sell it in quantities of five (5) pounds at a time.

23. After the exchange, Agents observed FISHER remain in the parking lot area of the Hartman Park Regional Recreation Center. Surveillance on FISHER was terminated at this time.

24. Prior to the controlled purchases of methamphetamine from FISHER, Agents searched the CS and the CS's vehicle to make sure no narcotics or official advanced funds were located with a negative result.

25. The CS is currently assisting Agents and Task Force Officers with the Rutherford County Sheriff's Office (RCSO). The CS has been actively assisting law enforcement for approximately one month. During this time, the CS has been proven to be reliable and trustworthy. The CS has provided information on local drug traffickers that has been independently verified by law enforcement. The CS has a criminal history including, but not limited to, evading arrest, multiple charges of theft of property, possession/casual exchange of a controlled substance, probation

violations, vehicle theft, aggravated kidnapping, possession of a weapon while under the influence, possession of schedule II and schedule VI drugs for resale, and driving with a suspended/revoked license. The CS is currently cooperating with law enforcement in return for consideration on potential charges.

26. I believe the **Target Premises** to be FISHER's primary residence. The GPS location information from his phone shows that he is frequently located at the **Target Premises** overnight.

## INFORMATION ABOUT DRUG TRAFFICKING AND MONEY LAUNDERING

27. Through my training, experience and participation in this investigation and other narcotics-related investigations involving large amounts of controlled substances, and through my participation in financial investigations into the laundering of proceeds from the distribution of controlled substances, I have learned about drug trafficking organizations.[1] Based upon my own professional experience with respect to drug trafficking organizations, upon information obtained during specialized training and upon information provided to me by other law-enforcement investigators and by prosecutors, I am able to state that the following is true with regard to narcotics trafficking organizations:

   a. Drug traffickers typically maintain and have access to large amounts of cash in order to maintain and finance their on-going businesses. They often gain substantial profits by obtaining large amounts of controlled substances and distributing them in smaller quantities, often after diluting or "cutting" the controlled substances with other substances.

   b. Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the operation of the drug trafficking

---

[1] When I refer to "drug trafficking organizations," I mean all those enterprises or groups of people collectively involved in the illegal sale or distribution of controlled substances. When I refer to "drug traffickers," I mean the individuals involved in "drug trafficking organizations."

7

enterprise. Very often, these records will be maintained at a residence, vehicle, or business used by the drug traffickers, or by one of their associates.

c. Drug traffickers often hide contraband, proceeds of illegal drug trafficking, and records of illegal transactions in secure locations such as their own residences; in other locations which they control but which are titled in the names of others; at the residences of others who are participants, aiders, or abettors of the illegal drug conspiracy; at their businesses; in their vehicles; and/or in bank safe deposit boxes to conceal them from law enforcement officials.

d. Drug traffickers very often will conceal in their residences amounts of currency, financial records, precious metals, jewelry, and other items of value which are proceeds of their criminal activities.

e. Drug traffickers commonly maintain information such as names, addresses, telephone numbers, and other contact information of their associates or customers in the illegal drug trafficking organization in books, documents, cellular telephones, and other electronic devices. They commonly keep these items in locations which they can readily access, such as on their person, in their vehicles or at their residences. Seizure of telephones and the contact information in telephones or elsewhere is useful evidence which corroborates the identity of known callers and helps identify unknown co-conspirators who may have been intercepted and recorded discussing their drug trafficking. Drug traffickers, like law-abiding citizens, often keep their cellular telephones, and records relating to those telephones, for long periods of time even if they are no longer using those telephones or records.

f. Drug traffickers often live in residences titled in the names of others and they have utility and communication services in the names of others in an effort to avoid detection by law enforcement.

g. Drug traffickers commonly possess firearms, including handguns, shotguns, rifles, machine guns, and other weapons. They keep these weapons on their person and in their residences, or vehicles. These weapons are used to protect and secure their drugs, as well as their property and illegal profits from thieves due to the fact that drug traffickers are often times the victims of robberies.

h. I know that drug traffickers will often make notes about their illicit business activities, including information relating to their illicit drug and financial transactions, and contact information about their co-conspirators, while they are talking on their telephones at places such as their residences and vehicles even if they do not store or distribute drugs from that particular location. I also know that drug traffickers often store information about their illicit assets in their residences just as law-abiding citizens keep information about their financial activities at their residences.

## Drug Traffickers' Use of Cellular Phones

28.     Based upon my training and experience, I know that persons who are involved in the possession and distribution of controlled substances, and who conspire to do so, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, often also commit money laundering offenses, in violation of Title 18, U.S.C., Sections 1956 and 1957.

29.     Drug traffickers frequently communicate about their illegal activities over their cellular telephones.  Their phones contain contact names and numbers for their suppliers and customers, as well as other co-conspirators.  They also frequently use text messages to communicate about their purchases and sales with those same people.  They also store pictures and other data on their cell phones that can be evidence of their drug trafficking activities.

30.     I know that persons involved in such drug trafficking and related money laundering crimes commonly use their cellular phones to do the following:

    a.     Maintain records and other data from various forms of communication related to their sale and distribution of controlled substances and the laundering of proceeds from those sales;

    b.     Discuss and negotiate their sales of controlled substances via telephone calls and text messages, and keep phone numbers of their co-conspirators within their cellular phones.  Those individuals also frequently keep a list of names and numbers of customers and suppliers in the electronic address books within their cellular telephones;

    c.     Generate, transfer, count, record and/or store records, invoices, receipts, bank statements, and other related records;

    d.     Maintain addresses and telephone numbers of their co-conspirators; and

    e.     Store photographs of themselves, their co-conspirators, and their property, including photographs of controlled substances and proceeds from the sale of those controlled substances.

31. Additionally, based upon my training and experience, I know that persons who are involved in the possession and distribution of controlled substances, and who conspire to do so, in violation of Title 21, United States Code, Sections 841(a)(l) and 846, often carry multiple cells phones at once. They often use different phones to speak with their respective suppliers/customers/other co-conspirators in order to make it more difficult for law enforcement to intercept their calls and text messages. They also often will use a rotation of different cell phones for that same reason.

32. Finally, in my training and experience, examining data stored on cellular phones can uncover, among other things, evidence that reveals or suggests who possessed or used the device and where they travelled with the telephone.

## TECHNICAL TERMS

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

33. As described above and in Attachment B, this application seeks permission to search for and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 or Title 18, United States Code, Sections 1956 and 1957 that might be found at the **Target Premises**, in whatever form they are found. Records might be found in data stored on a computer's hard drive, a wireless telephone, a digital camera, a PDA, a tablet or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media under Rule 41(e)(2)(B).

34. *Probable cause.* I submit that if a computer wireless telephone, digital camera, PDS, tablet or other storage media is found at the **Target Premises**, there is probable cause to believe those records will be stored on that computer, wireless telephone, digital camera, PDS, tablet or other storage media, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

b. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

d. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

e. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

35. *Forensic evidence.* As further described in Attachment B, locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on any Device in the **Target Premises** because:

f. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks

and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

g. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

h. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

i. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

j. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## **CONCLUSION**

37. Based on the information contained herein, probable cause exists to believe that relevant items, including evidence and/or instrumentalities of violations of Title 21, United States

Code, Sections 841(a)(1), 846, and 843(b), and Title 18, United States Code, Sections 1956 and 1957 and other crimes will be found at the described herein. I therefore request that a warrant be issued to search for and seize the items listed in Attachment B at the **Target Premises**.

# ATTACHMENT A

**The Target Premises:** 2711 Jenkins Street., Nashville, TN 37208 as further described below:

2711 Jenkins Street is a single-story 1,724 square foot house that sits on a 6,970 square foot lot and features three bedrooms and two and a half bathrooms. The residence has a grey shingled roof with tan brick on the front of the residence. The sides of the residence have tan siding. There are tan brick stairs leading up to a single front door entrance. The numbers "2711" are located both white columns on the front porch. This also includes vehicles associated with a nexus of the **Target Premises**, other storage lockers/areas, detached closets, containers, and yard areas associated with the main residence and used in connection with or within the curtilage of residence.



2



# ATTACHMENT B

# LIST OF ITEMS TO BE SEIZED

1. Computers, Wireless Telephones, PDAs, Tablets, Digital Cameras, Electronic Storage Media ("DEVICE"). For any DEVICE whose seizure is otherwise authorized by this warrant, its contents may be searched for the records or information that is otherwise called for by this warrant, and:

    a. evidence of who used, owned, or controlled the DEVICE, such as logs, saved usernames and passwords, phone books, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;
    b. all telephone numbers and direct connect numbers or identities assigned to the device;
    c. call and direct connect history information, including incoming and outgoing numbers dialed or received;
    d. evidence indicating the DEVICE user's state of mind as it relates to the crime under investigation;
    e. evidence of the times the DEVICE was used;
    f. contextual information necessary to understand the evidence described in this attachment.

2. All records and information that relate to violations of Title 21, United States Code, Sections 841 and 846 or Title 18, United States Code, Section 1956 and 1957, and United States Code, Sections 924(c), including:

    i. Documents relating to or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances or analogues, including United States currency, buyers lists, sellers lists, pay-owe sheets, records of sales, log books, drug ledgers, computers, computer equipment, computer software, cellular telephones, personal telephone/address books (including electronic organizers, rolodexes, telephone answering pads), bank records, financial records, and storage records such as storage locker receipts and safety deposit rental records.

    ii. telephone book or list of contacts;

    iii. photographs and images;

    iv. lists of customers and related identifying information; any text messages which were drafted, sent or received;

    v. stored photographs, videos and text messages that were drafted, sent or received;

    vi. any stored media;

    vii. GPS location history;

    viii. internet search history

ix. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    x. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    xi. any information recording schedule or travel, including, but not limited to passports, travel vouchers, air travel receipts, gas receipts, hotel receipts, and meal receipts;

    xii. Records or documents pertaining to postal and private package delivery services, including air bills, receipts, containers, and packages;

    xiii. all bank records, checks, credit card bills, account information, and other financial records.

    a. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2. Articles of personal property relating to the existence of a conspiracy to import, possess and distribute controlled substances, including personal telephone/address books, including electronic organizers, telephone bills, photographs, and papers and documents containing lists of names and/or numbers of individuals involved in the possession and sale of controlled substances.

3. Articles of personal property relating to the obtaining, secreting, transferring, expenditure and concealment of United States currency or foreign currency, as well as assets derived from or to be used in the importation and/or sale of controlled substances or analogues, including books, receipts, records, bank statements, bank records, business records, money drafts, money orders, cashier's check receipts, passbooks, bank checks, safes, records of safety deposit boxes, and storage lockers.

4. Banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records.

5. Financial proceeds and articles of personal property relating to the sale of controlled substances or analogues, including United States Currency, artwork, precious metals and stones, jewelry, negotiable instruments and financial instruments including stocks, bonds, and deeds to real property.

6. Equipment to detect police activities and surveillance, including radio scanners and tape and wire

transmitter detectors.

7. Photographs of individuals importing, possession, distributing or manufacturing controlled substances.

8. Firearms, ammunition, destructive devices, or other weapons.

9. Documents and articles of personal property relating to the identity of the persons occupying, possessing, residing in, owning, frequenting or controlling the **Target Premises** to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility and telephone bills and receipts, photographs, cellular telephones, telephone answering pads, storage records, vehicle records, cancelled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, cancelled checks, and other records of income and expenditure, credit card and bank records, travel documents, personal identification documents, and documents relating to obtaining false identification, including birth certificates, drivers' license, immigration cards and other forms of identification in which the same person would use other names and identities other than his or her own.